# MUSA-OBREGON LAW PC

ATTORNEYS AND COUNSELORS AT LAW
140 Grand Street, Suite 307
White Plains, New York 10601
TEL (718)803-1000
FAX (866)788-8061

S. MICHAEL MUSA-OBREGON

PETER KAPITONOV*
MARIANNY REYES
KARL J. ASHANTI
SAMI EL CHERIF
ALEIX CUADRADO
NOEL AKINSOLA
MUHAMMAD SALMAN IQBAL

MELISSA BARBOSA KOBERNITSKI
Of Counsel

*Admitted NY, NJ

MANHATTAN OFFICE
757 THIRD AVENUE, 20TH FL
NEW YORK, NY 10017

**REPLY TO WHITE PLAINS OFFICE**


By ECF

July 24, 2026

Honorable Gary R. Brown, U.S.D.J.
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

Re: *Christian Manuel Laminia Guachambala v. Genalo, et al.,* No. 26-cv-2851 (GRB)

Dear Judge Brown:

Petitioner respectfully submits this response to Respondents' June 15, 2026 letter.

Mr. Christian Manuel Laminia Guachambala is not a stranger to this community, not a man hiding from the law, and not someone whose civil immigration case belongs in a punitive federal jail. He is a thirty-two-year-old father of a twelve-year-old child, a Washington Heights resident with a fixed home at 509 West 161st Street, and a working construction laborer who built a life in New York before ICE stopped him on the street while admittedly searching for someone else. The record before the Court shows the kind of person he is: Local 79 confirms that he has been a union member in good standing since October 7, 2021; his employer confirms that he worked as a Mason Tender for Litehouse Builders beginning November 3, 2021; his training records show that he completed Mason Tenders Training Fund courses and was recommended as a person of "good character" and physically able to perform safety-related construction duties; and a sworn community-support letter describes him as responsible, hardworking, caring, loyal, thoughtful, family-oriented, and "like family." This is the human being now held for months at MDC Brooklyn as a civil detainee—away from his child, his home, his work, and his community—based on an arrest the Government's own chronology shows began as a wrong-man stop and was justified only after the fact. Habeas relief here is not an act of leniency; it is the necessary restoration of liberty where the Government has not lawfully earned the extraordinary power to keep this man in a cage.

Respondents ask the Court to deny the writ without further briefing or hearing based on a narrow theory: because ICE issued a Visa Waiver Program (VWP) Final Administrative Removal Order (FARO) on

March 5, 2026, detention is now supposedly mandatory or at least permissible under 8 U.S.C. § 1231. That argument does not answer the Petition.

Petitioner is not asking this Court to review the VWP Final Administrative Removal Order. He is not asking this Court to decide removability. He is not asking for another bond hearing. He seeks release because the custody itself is unlawful. The detention arose from a wrong-person street operation, an unsupported vehicle stop, interrogation after ICE had no individualized basis to seize him, a post-encounter I-200, a next-day VWP order, no likely-to-escape showing under 8 U.S.C. § 1357(a)(2), no contemporaneous custody determination addressing the legality of the seizure, and many months of detention in the notorious MDC Brooklyn where ICE chose to place him. Those issues have never been adjudicated by any court.

The Government's own letter makes the problem plain. Respondents concede that ICE was "searching for another individual." They concede that officers "conducted a vehicle stop." They concede that the "interview revealed" Petitioner "was not the primary target." They concede that only during that post-stop interview did Petitioner allegedly disclose his citizenship and overstay, and only after that did a records check allegedly confirm his status. **They further concede that the VWP Notice of Intent and VWP Final Administrative Removal Order were not issued until March 5, 2026, the day after the March 4 street arrest.** See DE 9 at 1–2; Harris Decl. ¶¶ 8–11.

The Government also concedes the central statutory point: 8 U.S.C. § 1187 is not itself a detention statute. Respondents rely on *Lee v. Warden, Buffalo Federal Detention Facility*, No. 6:26-cv-6380, 2026 WL 1413151 (W.D.N.Y. May 20, 2026), for the proposition that "detention authority cannot be found under 8 U.S.C. § 1187(c)(2)(E)," and then attempt to shift to § 1231. DE 9 at 3–4. That concession matters. Once § 1187 is removed as a detention basis, the VWP waiver cannot do the work the Government asks it to do. It may limit how Petitioner contests removal, but it does not authorize ICE to stop the wrong person, conduct a suspicionless vehicle seizure, obtain admissions after the seizure, generate paperwork after the fact, and then imprison him without a lawful custody process.

I. **Section 1252 Does Not Bar This Court From Reviewing Custody**

This Petition challenges custody, not removal. The Petition does not ask this Court to vacate the FARO, reopen the VWP process, review removability, or decide any asylum-related claim. It asks whether ICE lawfully seized and continues to detain Petitioner. That is the traditional office of habeas corpus. See 28 U.S.C. §§ 2241(c)(3), 2243; *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *Munaf v. Geren*, 553 U.S. 674, 693 (2008).

Nor does 8 U.S.C. § 1252(a)(5), § 1252(b)(9), or § 1252(g) strip this Court of jurisdiction over the custody claims. In *Flores v. Mullin*, No. 26-cv-1855 (GRB), this Court rejected a similar effort to recast an arrest-and-detention habeas petition as a forbidden challenge to removal. The Court explained that what remains squarely within habeas jurisdiction are claims concerning the legality of arrest and the conditions of confinement. *Flores v. Mullin*, No. 26-cv-1855, slip op. at 5–7 (E.D.N.Y. Apr. 8, 2026).

The Second Circuit's recent decision in *Mahdawi v. Trump*, No. 25-1113, does not require a different result. *Mahdawi* involved claims that the court found were in substance challenges to the removal process itself. But the Second Circuit recognized that detention-specific claims remain different, including challenges to the statutory framework permitting detention and challenges to conditions of confinement. *Mahdawi v. Trump*, No. 25-1113, slip op. at 27, 31–32 (2d Cir. July 21, 2026). This case is detention-specific. Petitioner challenges the wrong-person vehicle stop, lack of individualized suspicion, lack of compliance with § 1357(a)(2), post-hoc arrest paperwork, lack of lawful detention authority, and

confinement at MDC. None of those questions requires the Court to review the FARO.

*Castro v. Department of Homeland Security*, 835 F.3d 422 (3d Cir. 2016), is likewise inapposite. *Castro* involved habeas petitions that sought to prevent expedited removal under 8 U.S.C. § 1225(b)(1). This case does not seek review of an expedited-removal order. It seeks release from unlawful custody. The Supreme Court has long recognized that § 2241 remains available for statutory and constitutional challenges to post-order detention. *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001).

II. **The Government's Concession That § 1187 Is Not a Detention Basis Defeats the VWP Shortcut**

Respondents' letter relies on the VWP waiver to narrow Petitioner's rights, but then concedes that § 1187 is not the actual detention authority. That concession is dispositive of the Government's attempt to use the VWP as a jurisdictional and remedial shield.

The VWP statute limits the right to contest removal, other than on asylum-related grounds. 8 U.S.C. § 1187(b). But it does not authorize detention. *Lee* correctly held that the VWP does not contain its own detention provision and that detention must be justified by another statute. 2026 WL 1413151, at *4–5. *Quispe v. Becerra*, No. 1:25-cv-2002-CSK, reached the same conclusion, holding that § 1187(c)(2)(E) does not supply detention authority because it says nothing about detention. See *Quispe v. Becerra*, No. 1:25-cv-2002-CSK, slip op. at 8–10 (E.D. Cal. Dec. 31, 2025).

That leaves Respondents with § 1231. But § 1231 cannot retroactively legalize the March 4 stop and arrest. It cannot cure racial profiling. It cannot supply the missing § 1357(a)(2) likely-escape finding. It cannot transform post-stop statements into pre-stop probable cause. And it cannot erase the Government's failure to produce a firsthand declaration from an arresting officer, the target packet, the target photograph, the target description, the operation plan, or any contemporaneous document showing why Petitioner—not someone else—could lawfully be stopped before officers interrogated him.

III. **The Government's Own Chronology Shows a Wrong-Person Stop Followed by Post-Hoc Justification**

The Government's chronology is the heart of this case. ICE once again unsurprisingly claims it was searching for someone else. Petitioner was not the target. ICE stopped the vehicle anyway. Only after the stop and field interview did ICE learn Petitioner's immigration information. Only after that did ICE conduct a records check. Only then did ICE claim authority to arrest.

That sequence matters because the Fourth Amendment and § 1357(a)(2) require preexisting justification. A vehicle stop is a seizure. *Brendlin v. California*, 551 U.S. 249, 255–57 (2007). Apparent ethnicity or Hispanic appearance cannot supply reasonable suspicion. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885–87 (1975). And for a warrantless civil immigration arrest inside the United States, § 1357(a)(2) requires not only reason to believe the person is in violation of immigration law, but also reason to believe the person "is likely to escape before a warrant can be obtained." 8 U.S.C. § 1357(a)(2).

Respondents offer no such likely-escape showing. They do not claim Petitioner fled. They do not claim he resisted. They do not claim he was violent. They do not claim a traffic infraction. They do not claim they had a judicial warrant. They do not identify any fact known before the stop showing that Petitioner was likely to escape before a warrant could be obtained. The only facts they identify came after the stop.

This Court has already addressed this problem. In *Flores*, where ICE again claimed a non-target person "matched the description" of a target, the Court held that post-encounter issuance of an administrative

warrant may be justified only if the required "likely to escape" assessment under § 1357 has been undertaken. No such showing was made there. No such showing was made here either. *Flores*, No. 26-cv-1855, slip op. at 3–4.

The I-200 does not cure the defect. The I-200 is dated March 4, 2026, but the Government's own chronology claims that the grounds for it were supposedly assembled during and after the stop. The I-200 checks boxes for biometric confirmation/records check and statements allegedly made by Petitioner, but not for the execution of a charging document or pending removal proceedings. Harris Decl. Ex. A. That is not preexisting cause for the vehicle stop. It is evidence that ICE stopped first and justified later.

The FARO is even less helpful to Respondents. It was issued and served on March 5, 2026 at approximately 6:20 p.m, more than 24 hours after he was in jail. Harris Decl. ¶ 11 & Ex. C. A next-day removal order cannot supply the legal basis for a prior-day street seizure.

IV. **The Wrong-Man Explanation Requires Scrutiny, Not Deference**

Respondents' letter provides no target photograph, no physical description, no target packet, no contemporaneous surveillance notes, no radio traffic, no body-camera or vehicle-camera footage, no field notes, and no declaration from an arresting officer with firsthand knowledge. Instead, the Government relies on a declaration by Deportation Officer Harris, who states that her representations are based on review of DHS records, databases, consultation with colleagues, and some personal knowledge. Harris Decl. ¶ 1. That is not enough where liberty turns on what the arresting officers knew before they stopped the vehicle.

This Court has repeatedly warned against uncritical acceptance of the "wrong man" or "matched description" rationale. In *Sanchez Alfaro v. Mullin*, the Court observed that the "matched description" explanation had become so common in ICE enforcement cases that it "must be examined carefully." No. 26-cv-0766, 2026 WL 734348, at *2 n.6 (E.D.N.Y. Mar. 16, 2026). In *Garcia Lanza v. Noem*, this Court addressed a strikingly similar wrong-person arrest, where ICE targeted the petitioner because he supposedly looked like someone else, discovered the mistake, and then completed post-arrest paperwork. The Court wrote: "This isn't how things are supposed to work in America." No. 26-cv-0029, 2026 WL 585130, at *1–2 (E.D.N.Y. Mar. 3, 2026).

This case presents the same structural danger. ICE says it was looking for someone else. It admits Petitioner was not that person. It does not disclose the target's description. It does not show the target photograph. It does not explain why Petitioner reasonably matched the target before the seizure. It does not identify the arresting officer's firsthand observations. The Government's "wrong man" theory cannot be accepted on a paper record built from hearsay and after-acquired information.

**V. The Government's "Consensual Field Interview" Label Cannot Survive the I-213, the I-200, or the Reality of a Targeted Street Operation**

Respondents attempt to sanitize the arrest by calling it a "consensual field interview." But their own record shows something very different. This was not a casual sidewalk conversation. It was a targeted street enforcement operation in Washington Heights involving federal officers from at least two DHS components: ICE Enforcement and Removal Operations, assisted by Customs and Border Protection. According to Respondents, those officers were "searching for another individual," were conducting surveillance outside the target's residence, claimed that Petitioner matched the physical description of the "primary target," and then "conducted a vehicle stop." DE 9 at 1–2; Harris Decl. ¶ 8. That is not consent. That is a seizure.

The I-213 confirms the coercive sequence. The Government's own Form I-213 places the initial observation at approximately 17:40, the street stop at approximately 17:45, and the arrest at approximately 17:50. It then states that Petitioner was transported to 26 Federal Plaza for processing and final disposition. The I-213 itself bears a later timestamp of 19:29, after the stop, arrest, transport, and processing had already begun. The officer who prepared the I-213 was not the arresting officer and expressly relied on information from others and post-arrest database review. In other words, the Government is asking this Court to accept an after-the-fact paperwork narrative prepared by a non-arresting officer as proof that an armed, multi-agency vehicle stop on a public street was somehow "consensual." That is not credible.

The lived reality of the encounter makes the Government's label even more implausible. Petitioner was not approached by a single officer asking whether he wished to speak. He was confronted during an enforcement operation by federal agents who, by their own account, believed they were closing in on their primary target. The street reality of these recent ICE operations is often : agents in masks, tactical gear and vests, visible law-enforcement insignia, police-marked vehicles or vehicles used for police operations, flashing lights, the specter of ICE agents breaking car windows, and armed officers carrying guns at their waists. A reasonable person in a car, surrounded on a Washington Heights street by ICE and CBP officers conducting a target operation, would not believe he was free to ignore them, decline questioning, close the car door, and leave.

That point is not rhetoric; it is basic Fourth Amendment law. A seizure occurs when, under all the circumstances, a reasonable person would not feel free to leave or terminate the encounter. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Florida v. Bostick*, 501 U.S. 429, 436–37 (1991). The threatening presence of multiple officers, visible weapons, official insignia, blocking movement, commands, and accusatory questioning are classic indicators of a seizure. And when officers stop a vehicle, the occupants are seized. *Brendlin v. California*, 551 U.S. 249, 255–59 (2007). The Government cannot convert a coercive vehicle stop into consent by adding the word "consensual" to a declaration.

The Government's own chronology defeats its theory. Respondents admit the officers were looking for someone else. They admit that the "interview revealed" Petitioner was not the primary target. Harris Decl. ¶ 8. At that moment, the reason for the stop ended. The officers should have left him alone. They had stopped the wrong man. Once his identity showed that he was not the person they were looking for, ICE had no authority to prolong the encounter, interrogate him about national origin, demand immigration information, run databases, or search for a new reason to arrest him. The Constitution does not allow officers to seize the wrong person first and then go fishing for a different basis to justify the seizure.

That is exactly what the record shows happened. Only after the stop did Petitioner allegedly disclose that he was a citizen and national of Spain, born in Ecuador, and had overstayed his visa. Only after that did officers conduct a records check. Only after that did ICE issue the I-200. Harris Decl. ¶¶ 8–9. The I-200 confirms the post-hoc nature of the arrest theory: it is based on biometric confirmation, records checks, and alleged statements made to immigration officers—not on a preexisting charging document, pending removal proceedings, or any warrant already directed at Petitioner before the stop. DE 9-2. Those are after-acquired justifications. They cannot supply reasonable suspicion for the stop or probable cause for the arrest at the moment the seizure began.

This Court has already recognized the danger in precisely this kind of "matched description" explanation. In *Sanchez Alfaro v. Mullin*, this Court warned that the "matched description" rationale has become so common in ICE cases that it "must be examined carefully." No. 26-cv-0766, 2026 WL 734348, at *2 n.6 (E.D.N.Y. Mar. 16, 2026). In *Garcia Lanza v. Noem*, ICE targeted the wrong man

because he supposedly looked like someone else, realized its mistake, and then completed post-arrest paperwork to justify the seizure. This Court condemned that practice in unmistakable terms: "This isn't how things are supposed to work in America." No. 26-cv-0029, 2026 WL 585130, at *1–2 (E.D.N.Y. Mar. 3, 2026). And in *Flores v. Mullin*, this Court confronted another vehicle stop involving Hispanic occupants, alleged racial profiling, and a person who was not the target of the operation. The Court refused to treat that sequence as routine immigration enforcement and recognized that such facts present serious Fourth Amendment and habeas concerns. No. 26-cv-1855, slip op. at 1–4 (E.D.N.Y. Apr. 8, 2026).

The same scrutiny is required here. Respondents have not produced the target packet. They have not produced the target photograph. They have not produced the target's physical description. They have not produced body-camera footage, vehicle-camera footage, radio traffic, field notes, or the operation plan. They have not submitted a declaration from the arresting officer with firsthand knowledge. They have not explained why Petitioner objectively matched the target before the vehicle was stopped. They have not identified a traffic violation. They have not identified any fact known before the stop showing that Petitioner was removable. And they have not identified any fact showing that he was likely to escape before a warrant could be obtained, as required by 8 U.S.C. § 1357(a)(2).

The Government therefore asks this Court to accept the most coercive version of events as consent: a combined ICE/CBP target operation; officers searching for another person; a vehicle stop; a street interrogation; a wrong-man identification; post-stop immigration questioning; a records check; and then an I-200 generated after the encounter. That is not a consensual interview. It is an unlawful seizure followed by an after-the-fact search for a detention theory. Because the detention flows directly from that seizure, habeas relief should be release—not another bond hearing, not another paper review, and not deference to an I-213 that was prepared after the fact by someone who was not even the arresting officer.

## VI. **The March 16 Bond Hearing Did Not Adjudicate These Claims and Cannot Cure the Illegal Arrest**

Respondents rely heavily on the March 16, 2026 immigration-court bond hearing. But that hearing did not adjudicate the legality of the March 4 seizure. The immigration judge did not decide whether ICE had reasonable suspicion to stop the vehicle, whether the wrong-person explanation was objectively reasonable, whether the stop was infected by racial profiling, whether § 1357(a)(2)'s likely-escape requirement was satisfied, whether the I-200 was post-hoc, whether the next-day FARO could supply prior arrest authority, or whether ICE made a contemporaneous custody determination addressing those defects.

The transcript confirms the limited nature of the hearing. The immigration judge stated that this was a district-court-ordered custody redetermination hearing and that, "normally," a VWP overstay is not eligible for bond. Tr. 4. DHS offered the I-213, rap sheet, and FARO. Tr. 5. The immigration judge then denied bond based on danger and flight-risk findings. Tr. 16–22; Harris Decl. Ex. E. That is not a ruling on the Fourth Amendment, § 1357(a)(2), racial profiling, or the legality of detention.

Indeed, *Matter of A-W-*, 25 I. & N. Dec. 45 (BIA 2009), underscores why habeas release—not another bond hearing—is the proper remedy. The BIA held that immigration judges lack delegated authority under 8 C.F.R. § 1236.1(d) to redetermine custody for a VWP entrant who has not been placed in ordinary Part 1240 removal proceedings by service of an NTA. *Id.* at 45. The Government cannot rely on the VWP to deny ordinary bond jurisdiction, then claim a limited a bond hearing cures unconstitutional arrest and detention. Petitioner therefore does not seek another bond hearing. He seeks

release.

VII. **Section 1231 Does Not Save the Detention**

Respondents argue that § 1231 controls because ICE issued a FARO on March 5, 2026 and no asylum application is pending. Even assuming § 1231 now supplies the post-order detention framework, Respondents still lose.

First, § 1231 does not retroactively validate the March 4 arrest. A removal order issued the next day cannot supply preexisting cause for a prior street seizure.

Second, Respondents admit that the 90-day removal period expired on or about June 5, 2026. DE 9 at 4 n.1. After that period, § 1231(a)(6) is discretionary, not mandatory. It provides that certain noncitizens "may be detained" beyond the removal period; it does not say they must be detained forever. The Government has produced no lawful post-order custody review under 8 C.F.R. § 241.4 that addresses the actual issues in this case: illegal arrest, racial profiling, lack of § 1357 compliance, the absence of a valid contemporaneous custody determination, conditions at MDC, and whether continued civil incarceration is necessary.

Third, the Government's reliance on the March 16 immigration-court bond decision as a substitute for a post-order custody review is misplaced. The March 16 hearing occurred during the initial 90-day removal period. It was a bond hearing, not a § 241.4 post-order custody review. It did not adjudicate the arrest illegality. It did not determine whether Respondents complied with the post-order regulations. It did not decide whether continued incarceration at MDC is necessary after the expiration of the removal period. Respondents cannot transform that limited hearing into a permanent detention license.

Fourth, *Zadvydas* and *Clark* do not create a six-month safe harbor for illegal detention. *Zadvydas* construed § 1231(a)(6) to avoid serious constitutional problems, holding that post-removal-period detention is limited to a period reasonably necessary to effectuate removal and does not authorize indefinite detention. 533 U.S. at 689, 699–701. *Clark v. Martinez*, 543 U.S. 371 (2005), applied that same construction across the categories covered by § 1231(a)(6). Those cases do not hold that ICE may unlawfully arrest a person, ignore statutory arrest requirements, bypass meaningful custody process, detain him in a punitive federal jail, and then invoke six months as immunity from habeas review.

VIII. **MDC Conditions Independently Support Release Because This Is Civil Detention, Not Criminal Punishment**

The Government's request that this Court leave Petitioner in MDC Brooklyn should be rejected for an additional reason: the place of confinement matters. Petitioner is a civil immigration detainee. He is not serving a criminal sentence. He has not been convicted of a federal crime. Yet ICE has placed him in MDC Brooklyn, a punitive federal jail that judges in this District and the Southern District have repeatedly recognized as a facility marked by extreme lockdowns, serious staffing shortages, delayed medical and mental-health care, and conditions so severe that courts have reduced sentences or continued release for criminal defendants because of them.

*United States v. Chavez*, 710 F. Supp. 3d 227 (S.D.N.Y. 2024), is especially important. There, Judge Furman addressed whether a convicted narcotics defendant, subject to mandatory detention pending sentencing under the Bail Reform Act, should nevertheless remain at liberty. The court held that the conditions at MDC were themselves "exceptional reasons" making detention inappropriate. The court described MDC's problems as a "major, growing, and widely understood problem," including near-

perpetual lockdowns, dreadful conditions, long medical delays, widespread contraband, suicides, and a staffing crisis so severe that, as of November 2023, MDC was operating at only about 55% of its full correctional-officer staffing level.

The facts Judge Furman identified are not minor inconveniences. The court explained that MDC lockdowns keep people confined to their cells without visits, calls, showers, classes, or exercise, and that such confinement can amount to solitary or near-solitary confinement. The court further recognized that solitary-like confinement is psychologically painful, traumatic, and capable of causing long-term harm. That finding directly matters here because Petitioner has already spent many months in civil detention, including at MDC since April 10, 2026, according to the Government's own declaration.

The medical and mental-health concerns are equally significant. *Chavez* found that MDC is "notoriously" and sometimes "egregiously" slow in providing necessary medical and mental-health care, especially where outside treatment is required. The court collected examples where MDC failed to comply with court orders for medical treatment, including cases involving serious infections, surgery, diabetes-related dietary needs, and other essential care. The court also noted that critical mental-health treatment is lacking and discussed the death of an inmate with serious mental illness who had been placed in solitary confinement. These findings support Petitioner's argument that prolonged civil detention at MDC imposes a severe and unnecessary human cost, particularly where the legality of the arrest and custody has never been adjudicated.

The conclusion in *Chavez* is even more useful than its description of conditions. Judge Furman held that, in light of MDC's conditions and the defendant's circumstances, it would be "cruel and unjust" to detain him at MDC pending sentencing. The court further reasoned that, until MDC's staffing crisis is fixed, "the best the courts can do is not add unnecessarily to the inmate population" and thereby avoid worsening the already "frightening staff-to-inmate ratio." That reasoning applies with greater force here. If a convicted criminal defendant facing sentencing may remain at liberty because MDC conditions make detention inappropriate, then a civil immigration detainee whose arrest began as a wrong-man street stop should not be left in MDC while the Government asks the Court to ignore the legality of the seizure.

This Court has already applied the same logic in immigration habeas cases. In *Sanchez Alfaro*, this Court cited *Chavez* and other MDC cases in recognizing that MDC is so plagued by overcrowding and underfunding that judges in this Circuit have reduced or modified sentences for convicted criminals based on the conditions there. The Court emphasized that the petitioner there had not been charged or convicted of wrongdoing, yet had been imprisoned at MDC and would have remained there but for judicial intervention. In *Flores*, this Court made the same point even more directly: if courts in this District and the Southern District have reduced sentences for dangerous or violent criminals because of MDC conditions, it is "obvious" that MDC is not appropriate for civil detainees.

That is the precise point here. Petitioner is not asking for leniency. He is asking for habeas release from unlawful civil custody. The Government's own chronology shows that ICE was searching for another person, stopped a vehicle, determined Petitioner was not the target, and only then obtained the statements and records checks it now uses to justify detention. The Government also admits that Petitioner has been housed at MDC since April 10, 2026. The Court should not allow ICE to transform a contested civil arrest into months of punitive confinement in a federal jail whose conditions federal judges have repeatedly found severe enough to alter criminal custody outcomes.

For these reasons, *Chavez* reinforces the relief Petitioner seeks: release, not another bond hearing. The habeas question is whether the Government has lawfully earned the extraordinary power to keep this man in custody. Where the arrest began as a wrong-man stop, where § 1357(a)(2) has not been satisfied, where the VWP order was issued only after the arrest, where § 1187 is not a detention statute, and where the civil detention is being carried out inside MDC Brooklyn, continued custody is neither lawful nor equitable. The writ should issue, and Petitioner should be released under reasonable noncustodial conditions.

## IX. **The Proper Remedy Is Release**

Respondents ask the Court to deny the petition without further proceedings. Petitioner respectfully submits that the Court should instead grant the writ and order immediate release under reasonable noncustodial conditions.

If the Court concludes that additional factfinding is necessary before final relief, Petitioner respectfully requests an evidentiary hearing limited to the legality of the arrest and detention. Respondents should be required to produce the actual arresting officers, the target packet, target photograph, target description, operation plan, surveillance notes, radio communications, body-camera or vehicle-camera footage, timestamped database queries, all versions of the I-200, I-213, VWP Notice of Intent, FARO, and all custody-determination or post-order custody-review documents.

But the present record already supports release. The Government concedes Petitioner was not the target. It concedes the vehicle stop. It concedes the status information came during the post-stop interview and records check. It concedes the FARO issued the next day. It concedes § 1187 is not a detention basis. It concedes the 90-day period has expired. It has not produced a firsthand arresting-officer declaration, a target description, a target photograph, a likely-escape finding under § 1357(a)(2), or a lawful post-order custody review. On this record, the Court should grant the writ.

For these reasons, Petitioner respectfully requests that the Court reject Respondents' request to deny the petition on the papers, grant the petition, and order Petitioner's immediate release from custody, subject only to reasonable noncustodial conditions of supervision. Petitioner further requests that the Court make clear that he may not be re-detained based on the same arrest episode absent notice, an opportunity to be heard, and a lawful custody determination before a neutral decisionmaker that addresses the statutory and constitutional defects raised in this petition.

Petitioner respectfully thanks the Court for its consideration.

Respectfully submitted,

/s/ S. Michael Musa-Obregon
S. Michael Musa-Obregon

MUSA-OBREGON LAW PC,
Counsel for Petitioner